# EXHIBIT B

KIBLER FOWLER & CAVE LLP
Matthew J. Cave (SBN 280704)
mcave@kfc.law
Cristyn N. Chadwick (SBN 280705)
cchadwick@kfc.law
Adam C. Pullano (SBN 298792)
apullano@kfc.law
11100 Santa Monica Blvd., Suite 360
Los Angeles, California 90025
Telephone:   (310) 409-0400
Facsimile:    (310) 409-0401

*Attorneys for Originate, Inc.*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*

**09/26/2022**
**Clerk of the Court**
BY: JEFFREY FLORES
Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# COUNTY OF SAN FRANCISCO

| | |
|---|---|
| ORIGINATE, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>MAURO ARCHER & O'NEILL LLP, a D.C. limited liability partnership; FLETCHER STRATEGIES LLC, a Texas corporation; PERFECTED CLAIMS, LLC, a U.S. Virgin Islands limited liability company; and DOES 1 through 20,<br><br>Defendants. | CASE NO. **CGC-22-601968**<br><br>**COMPLAINT FOR:**<br><br>1. BREACH OF CONTRACT<br>2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING<br>3. QUANTUM MERUIT<br>4. PROMISSORY ESTOPPEL<br>5. NEGLIGENT MISREPRESENTATION |

COMPLAINT

# COMPLAINT

Plaintiff Originate, Inc. ("Originate" or "Plaintiff") complains and alleges on information and belief as follows:

# INTRODUCTION

Defendants are an out-of-state law firm and the limited liability companies it created to benefit from the unfortunate but lucrative market for claims by California wildfire victims. Defendants sought to reduce overhead costs associated with onboarding tens of thousands of claims each fire season, so they contracted with a California innovation firm, Plaintiff Originate, to develop a platform to manage the claims and improve the user experience. Defendants eventually sought to provide a self-service "mobile experience," through which wildfire victims could seek help, enter their claim information, and then track the claim through litigation (which other law firms would manage). The idea was novel and would be highly profitable; however, much work was required before any "mobile experience" could be ready for launch.

The parties' contract did not define a timeline or end-product. Rather, the contract accounted for various phases of development defined by a series of Statements of Work ("SOW"). Originate worked closely with Defendants during the highly collaborative process—interviewing case managers, victims, local counsel, and more—all while checking in regularly with Defendants and updating product requirements.

By January 2022, the product was ready for launch and the parties agreed to SOW #6, which, at that point, involved mostly post-launch work. However, despite having developed a ready-for-market product, shortly thereafter, Defendants abruptly and unexpectedly changed course. When they discovered their work for wildfire victims was not as lucrative as they anticipated, they decided to shift their focus to multi-district tort litigation. In so doing, they also decided not to pay Originate's outstanding invoices. In an effort to avoid the payments contractually due, Defendants fabricated claims that the product was not created as agreed, thereby forcing this litigation. Defendants' about-face refusal to pay Originate for the work it performed has caused—and continues to cause—major financial and other problems for Originate. Originate seeks payment for the work it performed for Defendants.

**PARTIES**

1. ORIGINATE is, and at all relevant times was, a Delaware corporation with its principal place of business in Los Angeles, California.

2. Defendant MAURO ARCHER & O'NEILL LLP is, and at all relevant times was, a Washington, D.C. limited liability partnership with its principal place of business in Washington, D.C.

3. Defendant FLETCHER STRATEGIES LLC is, and at all relevant times was, a Texas limited liability corporation with its principal place of business in San Antonio, Texas.

4. Defendant PERFECTED CLAIMS, LLC is, and at all relevant times was, a limited liability company formed under the laws of the Virgin Islands. Its principal place of business is unknown at this time.

5. Plaintiff is unaware of the true names and capacities of the defendants sued as DOES 1 through 20, inclusive, and it, therefore, sues these defendants by fictitious names. Plaintiff is informed and believes, and on that basis alleges, that each of the Doe Defendants is in some manner liable to Plaintiff. Plaintiff will amend this Complaint to state the true names and capacities of DOES 1 through 20 when their names and capacities, along with their responsibility for the actionable conduct alleged herein, have been ascertained.

6. Plaintiff is informed and believes, and on that basis alleges, that Defendants were, at all times mentioned, the agents, servants, principals, alter egos, and employees of each other, or otherwise acting with the full knowledge and consent of each other. Plaintiff is further informed and believes, and on that basis alleges, that in doing all the things alleged in this Complaint, Defendants were acting in the scope and authority of their agency, servitude or employment or otherwise within the scope of such knowledge and consent. As such, each of the Defendants is responsible for the liabilities of the other Defendants, as alleged herein.

**JURISDICTION AND VENUE**

7. Jurisdiction is proper in the Superior Court of the State of California for the County of San Francisco pursuant to section 410.10 of the California Code of Civil Procedure.

8. Jurisdiction and venue are proper in the Superior Court of California for the County

of San Francisco pursuant to section 10.3 of the Agreement, which states in relevant part: "Any dispute arising out of this Agreement shall be subject to the exclusive jurisdiction and venue of the California state courts located in the County of San Francisco . . . ."

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

*Background*

9. Since 2010, wildfires have presented an increasing threat in California, causing hundreds of millions of dollars in property damage and displacing thousands of families annually. In 2018, the Northern California "Camp Fire" was the most expensive natural disaster in the world in terms of insured losses.

10. The law firm Mauro Archer & O'Neill LLP ("Mauro Archer") sought to capture the wildfire litigation market, which can exceed tens of thousands of clients each year. Mauro Archer focuses on client on-boarding, *i.e.*, bringing in many clients whose cases are then referred to other law firms to manage.

11. To assist with the large number of California wildfire cases that Mauro Archer expected to bring in, the firm created another entity, Fletcher Strategies LLC ("Fletcher"), to manage its wildfire tort marketing and onboarding business.

12. Fletcher supervised the intake of new wildfire victims as potential clients and established a case management system to allow Mauro Archer to track their cases. Cases were referred to Watts Guerra LLC, a partner of Mauro Archer, for actual litigation.

13. Mauro Archer funded Fletcher, though additional financing was provided out-of-pocket by Christian Archer, a non-lawyer partner in Mauro Archer.

14. Originate is a US-based agile innovation firm that works with clients to build digital product strategies and roadmaps, accelerate development with advanced technologies and best-in-class integrations, and deliver products that provide seamless customer and employee experiences to leapfrog competitors.

15. Originate's work process is highly collaborative, working closely with each client to fully understand the client's needs and deliver the best results. Originate begins with an "ideation session," during which Originate team members meet with the client to discuss what is

needed from the final product, including working back through what is needed to support that final product. This process is otherwise known as "requirements gathering." At the end of this process, Originate presents to the client a list of the client's requirements. Originate then proceeds to design a digital product, up to and including an interactive demonstration of the final user interface, known as a "clickable wireframe." Originate does not sell physical products; rather, it creates a digital deliverable through services rendered to assist the client in creating whatever the client needs.

### *Fletcher Hires Originate*

16. In or about August 2020, Fletcher approached Originate to assist Fletcher in developing a platform to manage the tens of thousands of claims that Mauro Archer had expected to receive annually, as well as improve the user experience. Through Fletcher, Mauro Archer sought to innovate the tort space by automating data capture. Specifically, Fletcher eventually sought to develop a self-service "mobile experience," through which wildfire victims could seek help, enter their information to allow Mauro Archer to set up the claim, and then track the claim through litigation—eliminating the overheard cost for numerous client-facing claims managers performing intake.

17. Fletcher contracted with Originate, effective September 15, 2020, through a general Consulting Agreement ("Agreement"). The Agreement did not identify a particular end-product or result. Originate would work closely with Fletcher to define its requirements and then tailor a plan to satisfy those requirements. Accordingly, the Agreement provided that Originate and Fletcher would agree upon a Statement of Work ("SOW") that would define Originate's services to be performed during a certain time period.

18. The entire project was not (and could not be) laid out in a single SOW; rather, the Agreement provided that the parties would enter into additional SOWs down the road, as the project progressed. With the completion of each SOW, Originate and Defendants knew that the project would evolve and Fletcher's requirements would change. Accordingly, Originate and Fletcher understood that Originate would work with Fletcher to draft a subsequent SOW to address Fletcher's needs from Originate.

19. Originate would also be compensated at the rates provided in each SOW, including expenses such as costs of travel and lodging expenses. Payment was due within fifteen days after receipt of Originate's invoice ("Due Date"). If payment was not received within five days of the Due Date, Fletcher would be assessed a late charge equal to 1.5% of the amount owed for each month Fletcher was late.

### *Originate Begins Consultation*

20. SOW #1 outlined the initial set of deliverables, which echoed Originate's preliminary process. It does not promise a specific product. The parties understood that the product must be defined by the clients' needs through the collaborative "requirements gathering" phase, which is the first step of the process.

21. In or about September 2020, Originate team members began the collaborative "requirements gathering" phase by meeting with employees from Fletcher, including Mr. Archer, case managers, and senior staff, to assess the requirements of any self-service mobile experience.

22. From these meetings, Originate learned that the mobile experience would have to begin with a comprehensive case management system. In order to be a "self-service" experience, the system had to replace the extensive work of a claims manager, including to account for all the possible relevant facts that a potential victim would describe, as well as the questions that a claims manager would follow-up with based on the victim's responses. Originate would have to work with claims managers, victims, local counsel, and others to discover all the possible logic trees for the system. It would need to develop software to process that information, store it in an accessible format, and more. Additionally, the system would need to be stress-tested with actual claimants before becoming available for wide-scale launch. Per the deliverables for SOW #1, Originate established and presented a plan for developing a responsive product, including, but not limited to, establishing the requirements for a case management system with potential victims and local counsel, developing the website, stress testing the system, and all the while responding to the changing needs of all the stakeholders, including Defendants.

23. Fletcher agreed with this plan and executed SOW #2, which provided that Originate would help Fletcher establish a website to form the foundation for the digital onboarding

and case management platform. SOW #2 was effective September 29, 2020.

24. With the basic platform established, Fletcher then agreed to SOW #3, to align the product to the client's real-time needs, including to start coding, deliver a "foundational build," and then input user stories to address potential problems and "poke holes" in the build. SOW #3 was effective December 23, 2020.

25. In early 2021, Mauro Archer and Fletcher were receiving substantial earnings from wildfire victims' claims and created another entity, Perfected Claims, LLC ("Perfected"), in the Virgin Islands, presumably for tax benefits on the payouts from tort claims (Perfected, together, with Mauro Archer, Fletcher and Does 1-20, "Defendants"). While Fletcher continued to be the signatory to the contract, it was understood that Perfected would use the system and receive the funding that would be used by Mauro Archer to pay Originate's fees under the contract. Each of Defendants benefitted from Originate's services.

### *Originate Prepares to Help Fletcher Take the Product to Market*

26. In or about March 2021, Defendants approached Originate about the status of the self-service mobile experience. In particular, Defendants claimed they wanted a completed project by the beginning of the fire season in August. Originate explained that SOW #3, which had been drafted collaboratively and agreed to by Defendants, did not provide for a completed project by August. Any system would need to be tested and validated before launch, as had been expressly and repeatedly communicated to Defendants throughout the highly collaborative process. Indeed, extensive testing and increasing requirements were added, at Defendants' direction, as Defendants and Originate met weekly to discuss the changing needs of this self-service mobile experience.

27. For SOW #4, effective July 2, 2021, Fletcher hired Originate to take the product to launch. Indeed, Defendants demanded to be the ones to set and draft Originate's deliverables for SOW #4 and going forward. Additionally, Defendants designated a product leader named Tyler Chalfin, who would be primarily responsible for setting the priorities. Mr. Chalfin is the Chief Operating Officer at Mauro Archer, but supervised the project and even drafted the SOWs going forward on behalf of Fletcher.

28. The appointed claims manager, however, continued to inject requirements into the

process, which would delay any product launch.

29. During this time, the parties continued to have a productive and cooperative relationship. Indeed, Originate and Defendants discussed opening a joint venture to co-own and operate this novel, self-service litigation system. Defendants wanted Originate to be the "technology partner" while Defendants would handle the legal work.

30. Accordingly, Originate began working with attorneys on formation papers for the planned joint venture, which would include a board comprising of Christian Archer and Bill Samson, executives for Defendants, and Mikal Watts, who works for Defendants' partner Watts Guerra. On August 13, 2021, Originate sent the formation papers to Mr. Samson for his review and approval.

31. Moreover, motivated by the promise of a long-term business relationship, Originate pushed to accelerate the launch, including operating at cost with extra team members, beyond the terms of the agreement.

### Fletcher Begins Defaulting on Payments

32. Through SOW #3, Defendants had timely paid Originate's fees pursuant to the terms of the contract. Starting with SOW #4, however, Defendants began missing payments.

33. In or about October 2021, Defendants informed Originate that Mauro Archer was acquiring an $8 million line of credit, a portion of which would be used to pay Originate's outstanding invoices and fund Originate's work going forward. After Mauro Archer secured the credit, Defendants made several "catch up" payments. Of the seven monthly payments of $250,000 required under SOW # 4, Defendants paid only one, and half of the rest for a total outstanding balance of approximately $750,000, plus interest.

34. Nevertheless, based on the parties' good-faith discussions of a long-term business relationship and Defendants' promises of forthcoming payments, Originate continued to push forward towards launch.

35. In or around December 2021, the self-service mobile experience was almost ready for launch, but needed an additional two weeks of work. Thus, the parties agreed on SOW #5, which continued the foundational build for pre-launch features until the expected launch date in

mid-January.

36. With the product ready for launch, the parties negotiated SOW #6, executed on January 11, 2022, for post-launch tweaking, training, and maintenance. The parties continued to discuss their long-term plans as reflected in SOW #6's six-month term.

37. At the same time Defendants agreed to six more months of work with Originate, they defaulted on all the payments owed for SOW #5, which totaled $77,000 plus interest.

### *Defendants, Further Defaulting, Fabricate Claims to Terminate the Contract*

38. Despite executing SOW #6 and making an initial $148,000 payment pursuant to SOW #6, in early 2022, Defendants' business plans changed. In any given wildfire season, Defendants expected to put tens of thousands of victims into the claims process. On information and belief, in 2021, Defendants failed to timely market their services to potential claimants and faced increased competition for a smaller pool of wildfire victims than expected. Defendants received several thousand clients instead of the tens of thousands they had expected, resulting in a substantial decrease in revenue. Accordingly, even though the wildfire self-service product was ready for launch and despite their numerous promises of a long-term relationship with Originate, Defendants decided to shift their business strategy away from wildfire victims and focus more broadly on multi-district litigation.

39. On January 21, 2022, Mr. Samson and Mr. Archer approached Originate regarding its services. Not wanting to make payments on the hundreds of thousands they owed—or the additional hundreds of thousands they had promised to pay—they decided, transparently, to fabricate a story that Originate had failed to deliver a product as requested. They stated, despite executing a new SOW only weeks before, that Defendants had expected a mobile application, that Originate had not provided the mobile application, and that Originate was therefore in breach of contract. This false statement was shocking to Originate.

40. Originate replied to Defendants, noting that it had continuously satisfied its obligations as defined by the SOWs. Originate had delivered on each SOW and been re-engaged for more work. Indeed, Defendants clearly were satisfied with the product itself as SOW #6 was not for continued development, but post-launch maintenance on the product.

41. Furthermore, Originate noted that, starting with SOW #4, Fletcher had drafted the services and deliverables in each agreement. Indeed, at the time, Fletcher was actively using the case management system for which they are now refusing to pay. The mobile experience—a place for a claim victim to review the status of his/her claim or input information—was merely the final component of a far broader request from Defendants. Through numerous meetings and SOWs, Defendants had requested and contracted for a complete case management system, which Originate delivered. The mobile experience was only one aspect, and, based on Originate's extensive communications and confirmation from Fletcher, could not be developed without first establishing a functioning case management system. Additionally, Originate had spent significant time working with the wildfire victims and local counsel to confirm the end-user needs for any eventual application.

42. Originate also noted that, while the product had been extensively developed and tailored for wildfire victims' claims, it could be modified for the Defendants' apparent new focus on multi-district tort litigation. In fact, the parties had agreed to a joint venture and worked substantially towards that end goal. Originate relied on this stated intent. Defendants continued to lead on Originate that they were interested in a long-term relationship and would consider Originate's proposed repurposing of the developed system. Originate presented Defendants—at considerable cost—with multiple options to re-purpose the established platform, how the case management system was working and why it was still useful for any large-scale intake. Originate spent weeks planning, developing presentations, responding to questions from Defendants, and more. But in retrospect, Defendants had no intention of continuing any relationship or ever paying Originate for its continued work—even while Defendants continued to use what Originate had built.

43. Defendants owed Originate for its services, for which payment was past due, including interest. Defendants refused to pay even though they continued to use the case management system developed by Originate for at least several months after purportedly terminating the agreement. As Originate had been contracted in SOW #6 to maintain the case management system, it retained access to the system and could observe the continued use.

44. Originate brings this action to receive full compensation for the extensive work it performed under the contract with Defendants.

### FIRST CAUSE OF ACTION

**(Breach of Contract)**

**(Plaintiff Originate Against All Defendants)**

45. Plaintiff repeats, realleges, and incorporates by reference each and every preceding allegation, as though fully set forth herein.

46. Plaintiff and Defendants were parties to a services agreement ("Agreement"). The Agreement and subsequently executed SOW #s 1 through 6 are and were binding, valid, and enforceable agreements.

47. Under the Agreement, and pursuant to common and well-established custom, usage, and practice in the services industry, the parties agreed that Plaintiff would provide services and deliverables as specified in each SOW in consideration for fees and costs, as also specified in each SOW.

48. Plaintiff performed all the obligations, covenants, and conditions required of it under the Agreement, except to the extent any such obligations, covenants, or conditions have been excused, prevented, or waived by Defendants' acts and omissions.

49. Defendants materially breached the Agreement by failing and refusing to pay Plaintiff. Of the seven monthly payments of $250,000 required under SOW # 4, Defendants paid only one, and half of the rest for a total outstanding balance of approximately $750,000, plus interest. Defendants failed to pay the entirety of payments owed under SOWs #5 and #6, plus interest.

50. Plaintiff has demanded that Defendants pay all fees and costs due and owing to Plaintiff under the Agreement, including interest, but Defendants have failed and refused to do so.

51. As a direct and proximate result of Defendants' material breach of the Agreement, Plaintiff has been damaged in an amount in excess of the jurisdictional limits of this Court, in an amount subject to proof at trial.

## SECOND CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

**(Plaintiff Originate Against All Defendants)**

52. Plaintiff repeats, realleges, and incorporates by reference each and every preceding allegation, as though fully set forth herein.

53. In every contract or agreement there is an implied promise of good faith and fair dealing. This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

54. Defendants and Plaintiff entered into an Agreement by the terms of which Plaintiff would perform consulting services in consideration for payment by Defendants.

55. Plaintiff performed all, or substantially all the consulting services that the contract required it to perform or was excused from having to perform based on Defendants' breach.

56. Defendants failed to pay Plaintiff in accordance with the Agreement.

57. Defendants, knowing they had no intention to pay Plaintiff, continued to agree to additional SOWs including intentionally misleading Plaintiff with the promise of a repayment plan to induce Plaintiff to agree to provide additional services.

58. Through their misconduct, Defendants did not act fairly or in good faith, in breach of the covenant of good faith and fair dealing inherent in every contract, including the Agreement.

59. Plaintiff is further informed and believes, and based thereon alleges, that defendants, and each of them, acted and continue to act, with full knowledge of the consequences and damage being caused to plaintiff, by Defendants' actions, and Defendants' actions were, and are, willful, oppressive, and malicious. Accordingly, Plaintiff is entitled to punitive damages against Defendants, and each of them, in a sum according to proof at trial.

60. Plaintiff has incurred, and will continue to incur, attorneys' fees in the prosecution of this action and therefore demands such reasonable attorneys' fees and costs as set by the Court.

61. As a direct and proximate result of Defendants' material breach of the Agreement, Plaintiff has been damaged in an amount in excess of the jurisdictional limits of this Court, in an amount subject to proof at trial.

## THIRD CAUSE OF ACTION

### (Quantum Meruit)

### (Plaintiff Originate Against All Defendants)

62. Plaintiff repeats, realleges, and incorporates by reference each and every preceding allegation, as though fully set forth herein.

63. Plaintiff provided consultation, coding, product development, and other advisory services to Defendants to develop a case management system for Defendants wildfire victims' claims. During the contract period, Defendants used the case management system for their benefit. On information and belief, Defendants continued to use the case management system developed by Plaintiff through the extensive services described in the Agreement even after Defendants accused Plaintiff of breaching the contract.

64. Despite accepting Plaintiff's services and using the case management system provided, Defendants have failed and refused, and continue to fail and refuse, to pay Plaintiff in full for the services provided.

65. Defendants have deprived Plaintiff of the fair and reasonable value of the services provided to Defendants, the value of which is demonstrated by prior payments to Plaintiff under the Agreement outlined herein as well as the parties' prior course of dealing and consistent payment of Plaintiff's fees, and well-established industry custom and practice.

66. As a direct and proximate result of Defendants' failure and refusal to remit the fair and reasonable value of Plaintiff's services, Plaintiff has suffered damages in excess of the jurisdictional limits of this Court, in an amount subject to proof at trial.

## FOURTH CAUSE OF ACTION

### (Promissory Estoppel)

### (Plaintiff Originate Against All Defendants)

67. Plaintiff repeats, realleges, and incorporates by reference each and every preceding allegation, as though fully set forth herein.

68. Defendants made a promise clear and unambiguous in its terms that Plaintiff and Defendants would enter into a long-term business agreement through a joint venture or other

1 similar structure.

2  69.  Plaintiff relied on these promises as demonstrated by the considerable expenses
3 made, under Defendants' knowledge, participation, and direction, towards forming the venture.

4  70.  Plaintiff's reliance on these promises were both reasonable and foreseeable, and
5 known by Defendants, through multiple communications between executives of the parties.

6  71.  As a direct and proximate result of Plaintiff's reliance on the promises of
7 Defendants, Plaintiff has suffered damages in an amount that is in excess of the minimum
8 jurisdiction of this Superior Court.

## FIFTH CAUSE OF ACTION

**(Negligent Misrepresentation)**

**(Plaintiff Originate Against All Defendants)**

 72.  Plaintiff repeats, realleges, and incorporates by reference each and every preceding allegation, as though fully set forth herein.

 73.  Mr. Samson and Mr. Archer represented that Defendants would partner with Plaintiff in a joint venture.  The statements were made to induce Plaintiff into agreeing to additional SOWs, expediting its work with additional resources at cost, and to engage counsel towards the formation of a joint venture.

 74.  Relying on these representations, Plaintiff engaged counsel to prepare formation papers at significant cost.  Additionally, Plaintiff committed more resources to the product development, including individuals and material resources, beyond the requirements of the SOWs.

 75.  Plaintiff's reliance on these representations was justifiable.  The reliance on the promises was both reasonable and foreseeable because the promise was made by authorized agents of the Defendants through multiple communications.

 76.  Plaintiff suffered damages because of its reliance on Defendants' promise.  Plaintiff could have limited its committed resources and sought additional business instead of continuing to work with a non-paying client.  Additionally, Plaintiff spent a significant amount of money on legal fees for the formation of a joint venture.

**PRAYER FOR RELIEF**

WHEREFORE, ORIGINATE demands judgment against Defendants for the following:

a. Compensatory and general damages;

b. Pre- and post-judgment interest;

c. Exemplary or punitive damages;

d. Attorneys' fees;

e. Declaratory relief; and

f. Any other and further relief that the Court deems just and proper.

Dated: September 26, 2022         KIBLER FOWLER & CAVE LLP

By: _____
MATTHEW J. CAVE
CRISTYN N. CHADWICK
ADAM C. PULLANO
*Attorneys for Plaintiff Originate, Inc.*